IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVID KRITNER, *as Grandfather and Legal Custodian of J.K., a minor*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:23-cv-553-RAH [WO] |
| ALABAMA DEPARTMENT OF HUMAN RESOURCES, *et al.*, | ) ) ) | |
| Defendants. | ) | |
| HUNTER JAMES CARTER, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:23-cv-554-RAH |
| ALABAMA DEPARTMENT OF HUMAN RESOURCES, *et al.*, | ) ) ) | |
| Defendants. | ) | |
| GINGER HICKS, *as Next Friend of H.O., a minor*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:23-cv-557-RAH |
| ALABAMA DEPARTMENT OF HUMAN RESOURCES, *et al.*, | ) ) ) | |
| Defendants. | ) | |
| XAVIER WILSON, | ) ) | |

1

```
            Plaintiff,            )
                                  )
v.                                )        CASE NO. 2:23-cv-558-RAH
                                  )
ALABAMA DEPARTMENT OF             )
HUMAN RESOURCES, et al.,          )
                                  )
            Defendants.           )
```

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This consolidated action seeks monetary damages under Title II of the American with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.* Injunctive relief is not sought, and any remedy available under the Individuals with Disabilities Education Act (IDEA), 42 U.S.C. § 12132, *et seq.*, is expressly disclaimed.

According to the Plaintiffs, the Alabama Department of Human Resources (DHR) placed the Plaintiffs, who are or were minor children suffering from adverse mental health conditions, in facilities known as Psychiatric Residential Treatment Facilities (PRTFs) where they were to receive educational services at Specialized Treatment Centers (STCs). While placed at the PRTFs, the Plaintiffs allegedly received little-to-no education and were not integrated with their nondisabled peers.

The Plaintiffs[1] sue DHR, Nancy Buckner in her official capacity as the Commissioner of DHR, the Alabama State Department of Education (ALSDE), Eric Mackey in his official capacity as the Superintendent of ALSDE, the Alabama State Board of Education (State Board), the Marshall County Department of Human Resources (MCDHR), Sonya Murdock in her official capacity as the Director of

---

[1] Some plaintiffs are the representatives of legal minors previously institutionalized at PRTFs. All plaintiffs will be generally referred to as "Plaintiffs" throughout.

MCDHR,[2] the Lauderdale County Department of Human Resources (LCDHR), Jennifer Bolton in her official capacity as the Director of LCDHR, the Cleburne County Department of Human Resources (CCDHR), Marsha Busby in her official capacity as the Director of CCDHR, the Henry County Department of Human Resources (HCDHR), and Julie Lindsey in her official capacity as the Director of HCDHR.

The Plaintiffs assert claims under Title II of the ADA for "inadequate education" and improper "segregation" due to their disabilities.[3]  The Defendants move to dismiss all claims in the case.  Their motions will be granted.

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III. STANDARD OF REVIEW

In deciding a motion to dismiss, the Court considers only the allegations contained in the operative complaint and any attached exhibits.  *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  When evaluating a motion to dismiss under Rule

---

[2] Directors of the local county departments of human resources will be referred to as "County Directors" and the local departments as "County Departments" throughout.

[3] Plaintiffs filed four separate lawsuits that advance the same claims and theories in their respective operative complaints, which at this point are the Second Amended Complaints. (Doc. 76; Doc. 77; Doc. 78; Doc. 79.)  For clarity, the Second Amended Complaints, as a group, will be referred to as the "Second Amended Complaint" and only Docket No. 76 generally will be cited when appropriate.

12(b)(6), the Court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. But if the facts in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief,'" and the complaint must be dismissed. *Id.* (alteration adopted) (citing Fed. R. Civ. P. 8(a)(2)).

## IV. FACTUAL ALLEGATIONS

### A. The Plaintiffs

Plaintiff David Kritner is the grandfather and legal custodian of J.K., a minor. When J.K. began fifth grade, she started suffering from mental health issues. Around 2016, in part because of financial concerns over the cost of mental health treatment, J.K.'s grandparents relinquished custody of J.K. to Marshall County. Thereafter, J.K. was placed at various PRTFs for approximately five years. While at the PRTFs, "J.K. was not individually evaluated to determine her level of academic ability," "[t]he coursework [she received] was not progressive," and she was not "allowed to interact with children who were not also institutionalized." (Doc. 76 at 19.) In or

around October 2021, J.K. was institutionalized at a PRTF where she was assaulted "by staff and residents of the facility." (*Id.* at 23.) After the assault, Marshall County returned custody of J.K. to her grandparents.

Plaintiff Hunter James Carter was formerly placed in several PRTFs as a minor. "In 2007, when Carter was approximately 3 years old, he was located by . . . DHR, taken into custody [by] LCDHR, and placed in foster care." (Doc. 77 at 16.) When he was 10 years old, he was placed at his first PRTF and after that was "in and out of institutions from age 10 until age 18." (*Id.* at 16–17.) While at the PRTFs, Carter "was never assessed to determine whether he could attend general education public school," received a "curriculum [that] was not progressive and would often repeat or be disjointed," and "was never given access to his nondisabled peers." (*Id.* at 23.)

Plaintiff Ginger Hicks is next friend to H.O., a minor. In 2012, Henry County was awarded custody of H.O. and continues to have custody. When H.O. was 10 or 11 years old, he was placed at his first PRTF and "would be in and out of institutions from age 10 until approximately age 15." (Doc. 78 at 16.) While at the PRTFs, H.O. "was never assessed to determine whether he could attend general education public school," did not receive consistent curriculum, and "was never assessed to be given access to his nondisabled peers." (*Id.* at 20.)

Plaintiff Xavier Lee Wilson was formerly placed at several PRTFs. "In June of 2018, Division of Family and Children Services of the State of Georgia filed an action against Wilson's mother," and "[o]n October 16, 2018, a Certificate of Need for Services was issued for Wilson to place him in SafetyNet." (Doc. 79 at 16.) When Wilson was 13 years old, he was placed in his first PRTF and spent "approximately four years . . . in institutions." (*Id.* at 17.) While at the PRTFs, Wilson "was not individually evaluated to determine his level of academic ability," his "previous [Individual Education Plan (IEP)] was not followed," and he was not

"allowed to interact with children who were not also institutionalized at [the PRTF]."
(*Id.* at 18–19.)

All Plaintiffs broadly allege harm.  J.K., Carter, and Wilson allege harm in being unable to fully reintegrate into society and in not having a high school diploma. (Doc. 76 at 28; Doc. 77 at 24; Doc. 79 at 22.)  H.O. alleges that he suffered harm in being "behind peers of his age in grade level," in having worsened anger, anxiety, and depression, and in having "difficulty interacting with people."  (Doc. 78 at 21.)

**B.    The DOJ and ADAP Reports**

In 2019, the United States Department of Justice (DOJ) Civil Rights Division started "an investigation into schools at [P]RTFs and their compliance with the ADA."  (Doc. 76 at 29.)  As a result of the investigation, the DOJ issued a report (DOJ Report) that it "sent to the deputy attorney counsel of DHR and the general counsel of DOE on October 12, 2022."  (*Id.*)  In the DOJ Report, the DOJ "conclude[d] that the State, through its statewide system for delivering educational and therapeutic services, discriminates against students with emotional and behavioral disabilities in the foster care system who have been enrolled in [STCs] on the campuses of Alabama's psychiatric residential treatment facilities."  (Doc. 76-1 at 2.)

In July 2020, the Alabama Disabilities Advocacy Program (ADAP) published a report about Sequel Owens Crossroads, a PRTF in Alabama.  In the report, ADAP concluded that some children "as young as twelve years old" were "housed in deplorable living conditions, subjected to physical and emotional harm, and deprived of meaningful therapeutic opportunities."  (Doc. 76-2 at 1.)  According to the Plaintiffs, "Defendant Buckner was aware of the ADAP report [in that she] publicly announced an investigation on behalf of DHR."  (Doc. 76 at 31.)

C.    **The Current Lawsuit**

This consolidated action was initially filed on September 20, 2023, as five separate lawsuits.  These lawsuits were later consolidated, with one lawsuit being dismissed at the request of the Plaintiffs.  The remaining four Plaintiffs currently proceed under their respective Second Amended Complaints, which are virtually identical in their factual allegations and theories.  (Doc. 76; Doc. 77; Doc. 78; Doc. 79.)  The Defendants seek dismissal for various reasons.

## V. DISCUSSION

A.    **The Education Defendants' Motion to Dismiss**

The Education Defendants (ALSDE, State Board, and Mackey) move to dismiss the Second Amended Complaint for several reasons.[4]  They argue (1) the Plaintiffs lack standing to assert these claims against them; (2) the claims are redundant as between Mackey and the State Board since the Plaintiffs also sue ALSDE; (3) the Plaintiffs fail to allege sufficient facts to plausibly show deliberate indifference under Title II of the ADA for purposes of seeking monetary relief, and (4) the Second Amended Complaint fails to sufficiently allege a failure to satisfy the integration mandate in the ADA.

### 1.    **The Standing Assertion (Counts III and IV)**

While the Education Defendants do not directly contest the Plaintiffs' standing to bring a lawsuit in general, the Education Defendants do attack Article III standing because they "do not provide direct educational services to Alabama students, nor do they directly supervise those who do." (Doc. 84 at 5.)  Citing Ala. Code §§ 16-8-8 and 16-8-9, they state that in Alabama, public k-12 education is provided by county or city boards of education, and thus they are not proper parties

---

[4] The Court will not reach the redundancy issue as to the Education Defendants because the motions to dismiss will be granted on other grounds.

under the legal theories asserted by the Plaintiffs (inadequate education under Count III and improper segregation from their peers in violation of the integration mandate under Count IV), which all turn on the general responsibility to educate children in the State of Alabama.[5]

The Plaintiffs argue the Education Defendants are proper parties because the "Defendants admit they have general responsibility for the education of children, including Plaintiffs." (Doc. 87 at 4–5.) They assert that "[e]ven if local education agencies have shared responsibilities, it would not negate the [Education] Defendants' own liability." (*Id.* at 23.) The Plaintiffs also contend that "[i]t is the Defendants' statutory responsibility to set policies and procedures for the education of children like Plaintiffs." (*Id.*)

Article III of the Constitution limits the subject matter jurisdiction of federal courts to "cases and controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a [plaintiff] must establish that he has standing, which requires proof of three elements." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019)). Those three elements include (1) an injury in fact that (2) is fairly traceable to the defendant's actions and is (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Lujan*, 504 U.S. at 561).

All four Plaintiffs sufficiently allege injuries in fact and/or harm stemming from their time spent in PRTFs. For example, Kritner alleges that "J.K.'s anxiety

---

[5] Despite knowing that education governance occurs at the local level, the Plaintiffs have elected not to name any county, city, or local board of education as a defendant.

and depression are markedly worse now than before the intervention of MCDHR and her many institutionalizations" and that "[a]ll of the harm described herein is directly and proximately caused by J.K.'s time spent at the [P]RTFs described herein." (Doc. 76 at 29.) Similar allegations are made by the other Plaintiffs. These allegations are enough to establish an injury in fact, so that element is not at issue here.

Traceability is a different matter. As for traceability, the Plaintiffs allege Mackey and the State Board were responsible for "tracking, evaluating, monitoring, and educating public school children whether or not they were in [P]RTFs"; Mackey and the State Board's "authority allows them to visit [P]RTFs, demand documents, revoke endorsements, and other powers"; Mackey and the State Board "were . . . aware that [P]RTFs were not providing children at [P]RTFs . . . access to their nondisabled peers"; and they "were also aware that the education at the [P]RTFs was insufficient compared to that of a general education public school." (*Id.* at 3.) As for Mackey specifically, the Plaintiffs allege that the State Board, through Mackey, exercises "general control and supervision over the public schools of the state," (*see id.* at 14 (quoting Ala. Code § 16-3-11)), that Mackey's "job [is] to issue policies and procedures to be implemented around the state," and that "[t]he facilities wherein [the Plaintiffs] were institutionalized were provided an endorsement by Defendant Mackey's DOE policies and procedures," (*id.*).

As for the State Board, the Plaintiffs allege that the State Board asserts "general control and supervision over the public schools of the state"; "has general supervision of the education work of all charitable, penal, reformatory, and child-caring institutions, maintained in whole or in part by the state"; and that PRTFs fall within its general supervision. (*Id.* at 14–15 (citing Ala. Code §§ 16-3-11, 16-3-20).) With respect to ALSDE, the Plaintiffs allege ALSDE "is designed 'to assist in executing the policies and procedures authorized by law and regulations of the State

9

Board of Education,'" (*id.* at 12 (quoting Ala. Code § 16.2.2)), and that it must provide an *Education Endorsement of Operation* (Endorsement) to PRTFs[6] before they can receive an appropriation from the Education Trust Fund. (*Id.* at 13 (citing Ala. Admin. Code § 290-8-8-.01).) In addition, they allege that ALSDE may request records from PRTFs, visit them without notice, and revoke an Endorsement. (*Id.* at 13.)

Key to the legal issues at play here – and the Education Defendants' standing assertion – is that general control and supervision is not enough to demonstrate traceability. General control and supervision over Alabama public schools and the educational work of all Alabama-based public child-caring institutions is legally and factually insufficient to plausibly show that the Plaintiffs' individualized injuries are fairly traceable to Mackey and the State Board. *See Jacobson*, 974 F.3d at 1254 ("[T]he Secretary's position as the chief election officer of the state with general supervision and administration of the election laws does not make the order in which candidates appear on the ballot traceable to her." (internal quotation marks and citations omitted)).

And as to ALSDE, the Plaintiffs allege that their harm is directly and proximately caused by their time spent at PRTFs. But they fail to provide sufficient factual allegations, or any citations to legal authority, showing that ALSDE was responsible for providing educational services at each of the Plaintiffs' PRTFs. Although ALSDE is tasked with providing an Endorsement to STCs under Ala.

---

[6] The Plaintiffs repeatedly refer to PRTFs, or RTFs, throughout the Second Amended Complaint, but they do not acknowledge STCs. As such, they seemingly conflate PRTFs and STCs. For example, the Plaintiffs allege that PRTFs are required to obtain an Endorsement from ALSDE before receiving an appropriation, (*see* doc. 76 at 13), but the Alabama Administrative Code section that they cite specifically relates to STCs. *See* Ala. Admin. Code § 290-8-8-.01 ("[A]ll specialized treatment centers . . . shall, before receiving any appropriation from the Education Trust Fund, be required to obtain an Educational Endorsement of Operation from the Alabama State Department of Education.").

Admin. Code § 290-8-8.01 before an STC can receive an appropriation from the Education Trust Fund, the Endorsement is only a prerequisite to funding, and thus does not itself constitute educational services. *See* Ala. Admin. Code § 290-8.8.-02 ("[STCs] receive[] appropriations from the Education Trust Fund to provide educational services to students in grades P-12."); *see also* Ala. Code § 16-8-8 ("The general administration and supervision of the public schools of the educational interests of each county . . . shall be vested in the *county board of education* . . . ." (emphasis added)); Ala. Code § 16-11-9 ("The *city board of education* is hereby vested with all the powers necessary or proper for the administration and management of the free public schools within such city and adjacent territory to the city which has been annexed as a part of the school district which includes a city having a city board of education." (emphasis added)). In addition, under Ala. Admin. Code § 290-8-8.09(a)-(b), it is the *local education agency* that must "ensure that a free and appropriate public education is provided."

The Plaintiffs cite no statute, regulation, or other legal authority that creates direct responsibility by the Education Defendants to provide educational services or any other extracurricular activities such as clubs and hobbies. Further, the pertinent statutes and regulations place those obligations, if any, on the local county and city education boards. The Plaintiffs therefore have failed to allege facts that show their injuries are traceable to the actions and responsibilities of the Education Defendants. The Education Defendants' motion to dismiss Counts III and IV is due to be granted on Article III standing grounds.

### 2.    Deliberate Indifference Under Title II of the ADA (Count III)

Along with their standing challenge, the Education Defendants also attack the Plaintiffs' factual allegations in Count III. The Court will address this argument although it is not required to do so.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II, a plaintiff must establish:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).

Typically, a Title II violation entitles a plaintiff only to injunctive relief. *Id.* "To get damages . . . a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" *Id.* (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)). Deliberate indifference is an "exacting standard." *Id.* (quoting *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017)). So, a plaintiff must prove that "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Id.* (quoting *Liese*, 701 F.3d at 344). "Moreover, in order to hold a government entity liable, the plaintiff must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf' had 'actual knowledge of discrimination in the entity's programs and failed adequately to respond.'" *Id.* (cleaned up) (quoting *Liese*, 701 F.3d at 349). For an official to qualify, he or she "must be high enough up the chain-of-command that his or her acts constitute an official decision by the

entity not to remedy the misconduct.'"  *Id.* (cleaned up) (quoting *J.S.*, 877 F.3d at 987).

The Education Defendants argue the Plaintiffs have not stated plausible claims for deliberate indifference in Count III.  They argue the Plaintiffs fail to allege specific facts showing how each of the Education Defendants had actual knowledge of disability discrimination in their education at the PRTFs specific to each of the Plaintiffs.  And to the extent the Plaintiffs rely on the DOJ and ADAP Reports, the Education Defendants assert that "[n]othing in the DOJ Report or the ADAP Report . . . mentions these Plaintiffs specifically, and the Second Amended Complaint fails to provide enough information outside of the DOJ Report to demonstrate actual knowledge."  (Doc. 84 at 18.)  According to them, the Plaintiffs "stop short of actually presenting facts that demonstrate [actual knowledge]."  (*Id.*)  The Education Defendants also argue that these reports cannot impute actual knowledge because "all but one of the Plaintiffs who attended [the] specific facilities [mentioned in the DOJ Report] did so before the DOJ created and delivered its Report to the Education Defendants, making it impossible to create the basis for actual knowledge on their part."  (*Id.* at 22–23.)  They assert that J.K. is "[t]he only Plaintiff who attended a facility after the DOJ" delivered its report, and at that time, J.K. "was not in DHR's custody and for only three instructional days, meaning she was not a 'foster child' in DHR custody and within the scope of the DOJ Report."  (*Id.* at 23.)

The Education Defendants also assert the Plaintiffs' reliance on the DOJ Report is misplaced because the report only serves as notice of potential allegations. And as for notice, they argue they could not have been put on notice before October 2022 when the DOJ Report was released because any investigation that may have

occurred prior to 2022 is not enough to put them on notice.[7] Moreover, they contend the Plaintiffs seemingly "confuse the PRTFs themselves and the corresponding STCs that provide an educational component." (*Id.* at 23.) And as a result, the Plaintiffs "fail to differentiate between staff at the two types of facilities and fail to include whether some of the alleged actions happened while the students were in an educational setting or a therapeutic or residential setting." (*Id.*)

The Plaintiffs argue the Education Defendants knew of the substandard education and discrimination that was occurring in facilities around the State of Alabama. They contend they sufficiently allege actual knowledge because the DOJ Report, which clearly states that the ADA had been violated, was mailed directly to general counsel for the State Board in 2022.

As for the ADAP Report, the Plaintiffs argue that, although it was not addressed to the Education Defendants, the Education Defendants had knowledge of the ADAP Report because it was discussed in the news media.[8] They also maintain that they need not allege that the Education Defendants were aware of any specific plaintiff or his or her harm because it is enough that the Education Defendants were generally aware of the discrimination within their programs.

Even giving the Second Amended Complaints a generous reading, the Plaintiffs have failed to sufficiently plead facts evidencing deliberate indifference. They do make broad, conclusory allegations that Mackey, ALSDE, and the State Board had actual knowledge of discrimination, but that is not enough for a monetary damage claim tied to each Plaintiff's individualized harm. For example, the

---

[7] The Education Defendants also note that "[w]hile STCs in Alabama enroll public school students, they are most often owned and operated by private companies, such as a [PRTF], and act independently from the State and defendants." (Doc. 89 at 11–12.)

[8] The Plaintiffs maintain that the timing of when the Education Defendants came to have actual knowledge will be developed through discovery.

Plaintiffs allege that the Education "Defendants were all aware that [P]RTFs were not providing children at [P]RTFs, like J.K., access to their nondisabled peers" and "were also aware that the education at the [P]RTFs was insufficient compared to that of a general education public school."  (Doc. 76 at 3.)  The allegations that the Education Defendants knew that students lacked access to nondisabled peers or of inadequate education are "factual inferences" that fail to state "the underlying facts on which the inference[s are] based."  *Conclusory*, Black's Law Dictionary (12th ed. 2024); *see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.") (citing *S. Fla. Water Mgmt. Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir. 1996), and *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).

In the Eighth Amendment context—where deliberate indifference by government officials is regularly at issue—courts regularly hold that conclusory allegations are insufficient to establish a deliberate indifference claim.  *See, e.g*., *Truss v. Daniels*, No. 12cv360, 2015 WL 4066871, at *17 (N.D. Ala. June 30, 2015) ("Awareness by the defendants that some inmates at [the correctional facility] suffer from diseases or infections does not establish their awareness of improper sanitation of barbering tools, the subjective component relevant to the instant Eighth Amendment claim."); *Connell v. Dunn*, No. 21-cv-639, 2022 WL 1215633, at *5 (N.D. Ala. Apr. 25, 2022) ("A conclusory allegation of personal knowledge is not enough; there must be factual allegations supporting the defendant's knowledge."); *Streeter v. Dep't of Pub. Safety*, 689 F. Supp. 3d 1312, 1334 (S.D. Ga. Aug. 28, 2023) (granting the defendant' motion to dismiss as to the plaintiff's claims for monetary damages under Title II of the ADA where the "allegations are merely 'conclusory,' lacking any allegation that [one defendant] had actual knowledge of discrimination such that he acted with deliberate indifference" (citation omitted)).

Pleading of deliberate indifference under Title II is no different.  Deliberate indifference must be specific to a defendant because imputed or collective knowledge cannot serve as the basis for such a claim.  *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).  The Plaintiffs allege that the Education Defendants were generally aware of allegedly insufficient education at the PRTFs.  However, such a broad allegation does not sufficiently describe how the Education Defendants' conduct, individually or as a group, was deliberately indifferent or how that indifference caused harm specific to each Plaintiff.  This is especially true when it is the local education boards that bear primary responsibility for educating children in their jurisdictions.  Accordingly, the Education Defendants' motion to dismiss Count III will be granted on this basis also.

### 3.    The ADA's Integration Mandate (Count IV)

Count IV raises an integration mandate claim under Title II's implementing regulations.  *See* 28 C.F.R. § 35.130(d).  Due to the integration mandate of the ADA, a public entity is required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  *Id.* The most integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B (2024).

In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court discussed the integration mandate:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

527 U.S. 581, 607 (1999).  To state a claim, the *Olmstead* court explained that a plaintiff must show three things: (1) that his or her disability does not prevent him or her from receiving treatment or services within the community at large, (2) that he or she does not oppose community-based services, and (3) the public entity can reasonably accommodate those services.  *Olmstead*, 527 U.S. at 607; *United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019) (describing *Olmstead*'s three elements).

The Plaintiffs broadly assert the Education Defendants have violated the mandate by segregating the Plaintiffs from their nondisabled peers.  This segregation was done through the denial of access to a general education and to outside clubs, hobbies, and extracurricular activities.  The Education Defendants argue that Count IV fails to sufficiently allege an integration mandate claim because there is no allegation of an "opinion offered by a State professional concluding that the students should be educated in a regular education setting rather than at an STC," which they assert is an essential element of the Plaintiffs' case.  (Doc. 84 at 26.)  In other words, they claim the Plaintiffs must, but have not, allege that an entity or individual "conducted an evaluation specific to any of these Plaintiffs and determined that placing them in a classroom at a local school would be appropriate."  (Doc. 89 at 8.) They rely on *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023), a Fifth Circuit Court of Appeals decision, which, according to the Education Defendants, holds "that a recommendation by a professional regarding a plaintiff's placement is a requirement under *Olmstead*."  (Doc. 89 at 7) (emphasis omitted).)

For their part, the Plaintiffs argue that *Olmstead* does not require a plaintiff to allege in his or her complaint, or show, that a treatment professional has recommended that a more appropriate setting was available or should be used. According to the Plaintiffs, to read that requirement into the mandate would enable a state to trap disabled individuals in placements, depriving them of their rights under

the ADA forever. And to the extent the Education Defendants rely on *United States v. Mississippi*, the Plaintiffs argue that their reliance is misplaced because the Fifth Circuit acknowledged that *Olmstead* does not require a "professional [to] testify as to the feasibility of integrating a disabled person into the general population," and no language in the opinion suggests that such a requirement be affirmatively pleaded in the operative complaint. (Doc. 87 at 15–16.)

To be sure, the Plaintiffs do not allege that a state professional, or anyone for that matter, has evaluated each of the Plaintiffs and has concluded that each Plaintiff should have been educated in a regular education setting rather than at an STC. If such an obligation exists, then certainly the Plaintiffs have failed to sufficiently state a claim for failure to satisfy the integration mandate under the ADA.

But "[s]ince *Olmstead*, lower courts have universally rejected the absolutist interpretation proposed by defendants." *United States v. Georgia*, 461 F. Supp. 3d 1315, 1323 (N.D. Ga. 2020). For example, in *Disability Advocates, Inc. v. Paterson*, the district court held that requiring a state professional to make a determination "would eviscerate the integration mandate" and "condemn the placements of [individuals with disabilities in adult homes] to the virtually unreviewable discretion of the various entities on whom the State relies." 653 F. Supp. 2d 184, 259 (E.D.N.Y. 2009), *vacated and dismissed on other grounds by Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012); *see also Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 539–40 (E.D. Pa. 2001) ("I do not read *Olmstead* to require a formal 'recommendation' for community placement . . . . *Olmstead* does not allow States to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities."); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) ("[I]t is not clear whether *Olmstead* even requires a specific determination by *any* medical professional that an

individual with mental illness may receive services in a less restrictive setting, or whether that just happened to be what occurred in *Olmstead*.").

To succeed on this claim, the Plaintiffs need only prove that the Education Defendants, as public entities, failed to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). A formal recommendation or determination as a prerequisite to suit is not required. But that does not mean the Plaintiffs can show a question of fact on this issue without evidence of a recommendation or determination supporting their allegation. That is still an evidentiary burden they must meet if and when the Education Defendants put it to the appropriate evidentiary test.

Like their standing argument, the Education Defendants also point to Alabama law to show that the Plaintiffs' integration claim fails on its face. Under Alabama law, the local county and city boards of education are responsible for the general administration and supervision of public schools. *See* Ala. Code §§ 16-8-8, 16-11-9; Ala. Admin. Code § 290-8-8-.09(a)-(b). These county and city boards are also responsible for providing educational services, programs, or activities, including a free and appropriate public education (FAPE), to the children in their jurisdictions. *See* Ala. Code §§ 16-8-8, 16-11-9; Ala. Admin. Code § 290-8-8-.09(a)-(b). The Second Amended Complaint is absent of plausible factual allegations that the Education Defendants are responsible for administering these educational services, programs, or activities. General control and supervision does not equate to educational services, and neither does the responsibility to provide an Endorsement. On this basis, the Plaintiffs have failed to state a plausible integration mandate claim. Count IV is therefore due to be dismissed.

**B.      The DHR Defendants' Motion to Dismiss**

The DHR Defendants (Buckner, the County Directors, and the County Departments) seek to dismiss the claims against them (Counts I and II) as well, for similar reasons as those raised by the Education Defendants.  They argue (1) the claims against Buckner and the County Directors (Murdock, Busby, Lindsey, and Bolton) are redundant given the identical claims against the agencies they represent; (2) the Plaintiffs lack Article III standing because Buckner, DHR, the County Departments, and the County Directors do not administer educational programs; (3) the Plaintiffs fail to allege cognizable disability discrimination;  and (4) the Plaintiffs have not pled plausible claims for deliberate indifference by Buckner and the County Directors.

**1.      The Standing Assertion**

Citing Ala. Code § 16-39-1 and Ala. Admin. Code § 290-8-9-.00, *et seq.*, the DHR Defendants argue the Plaintiffs lack Article III standing to bring their inadequate education claims against them.  In their view, the Plaintiffs lack standing because the DHR Defendants are not responsible for managing public education in Alabama and have no authority to conduct educational screening.  As they state it, they have no authority to (1) institute individualized education plans (IEPs) or determine eligibility for education services, (2) serve as a parent or surrogate for a child in educational decision making, or (3) issue Endorsements for STCs.  More broadly, they assert that since they do not administer educational programs, the DOJ Report has no application to them.  Thus, the Plaintiffs' education-related injuries are neither traceable to them nor redressed by a judgment against them.

The Plaintiffs argue that Article III standing exists for the education-related claims.  They believe standing exists because the DHR Defendants first placed the Plaintiffs in these facilities, exercised supervisory authority over these facilities, and were responsible for ensuring that the PRTFs allowed for care, supervision, and

services of the Plaintiffs.  The Plaintiffs also argue that the DHR Defendants have authority over educational components within these facilities because they are able to demand and receive proof of implementing children's needs and service plans. As for the County Departments and their Directors, the Plaintiffs contend that they have standing as to those Defendants because they are tasked with caring for children who are dependent, neglected, under insufficient guardianship, or otherwise handicapped.  And as to Buckner specifically, the Plaintiffs assert that Buckner is responsible for forming the licensing guidelines, and DHR is responsible for reviewing licensing applications.  Finally, the Plaintiffs argue that Alabama law does impose a duty on the DHR Defendants to act *in loco parentis*.

As for the integration mandate claims, the Plaintiffs contend that standing exists for several reasons: the DHR Defendants had custody over the Plaintiffs, they could have integrated the Plaintiffs with their peers by allowing them to participate in social activities, and they supervise, or have supervisory authority, over the PRTFs.  Plaintiffs rely on the following language from DHR's internal standards: "[a child's] complete[d] case file shall be kept current and include the following . . . [d]ocumentation of activities [in which] each child in DHR's custody is participating on a monthly basis to ensure each child is being given adequate opportunities for participation in recreational, social, cultural, enrichment, and education activities." (State of Ala. Dep't of Human Res., *Minimum Standards for Residential Child Care Facilities* 30 (3rd Rev. Aug. 27, 2019), https://perma.cc/ZU3A-RQW5; doc. 88 at 14 n. 31 (quoting *Minimum Standards for Residential Child Care Facilities* at 30).)

Again, standing requires (1) an injury in fact that (2) is fairly traceable to the defendant's actions and is (3) likely to be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61.  "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with

the manner and degree of evidence required at the successive stages of the litigation.'" *Bischoff*, 222 F.3d at 878 (quoting *Lujan*, 504 U.S. at 561).

Like their claims against the Education Defendants, the Plaintiffs do not sufficiently allege Article III standing as to DHR or the County Departments.[9] In their Second Amended Complaints, each Plaintiff alleges sufficient injuries in fact and/or harm stemming from their time spent in PRTFs. (*See* Doc. 76 at 28–29; Doc. 77 at 24; Doc. 78 at 21; Doc. 79 at 22.) For example, Plaintiff Carter alleges in part that he "has missed all developmental milestones during the time he was institutionalized," and "[a]ll of the harm described herein is directly and proximately caused by Carter's time spent at the [P]RTFs described herein." (Doc. 77 at 24.) The other Plaintiffs make similar allegations. Such allegations are enough to establish an injury in fact. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279–80 (11th Cir. 2017). So as with the Education Defendants, an injury in fact is not a bona fide issue here.

But like their allegations against the Education Defendants, traceability is the fatal issue. As for traceability, the Plaintiffs allege that the County Departments rely on DHR for placement of children like those here and that DHR, despite knowing of discrimination at the PRTFs, continues placing children in them. But that is not legally accurate. While DHR may have custody over a child, *see* Ala. Code § 12-15-314(a)(2), it is the treating physician that is responsible for a child's placement at a PRTF. *See* Ala. Admin. Code § 560-X-41-.04(1)-(2), (4)(a). And it is the local

---

[9] Standing as to Buckner and the County Directors will not be separately addressed because given that the Plaintiffs also sued DHR and the County Departments, any claim asserted against Buckner or a County Director is redundant and will be dismissed. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond).").

county or city board of education that is responsible for the general administration and supervision of the public schools in their jurisdictions, including the provision of FAPE, *see* Ala. Code §§ 16-8-8, 16-11-9; Ala. Admin. Code § 290-8-8-.09(a)-(b).  This includes any children located at PRTFs located within their jurisdiction. Thus, once again, Plaintiffs' claims—this time as to the DHR Defendants—fail on traceability concerns.

The Plaintiffs' *in loco parentis* argument does not alter the outcome on this issue.  Under Ala. Admin. Code § 660-5-54-.06, DHR does have "the authority to act in loco parentis for any child . . . in need of immediate health, welfare, protective, or other critical services" and, under Ala. Code § 38-2-6, DHR may "[d]esignate county departments as its agents under its rules and regulations to perform any of the state department's functions."  But there is no indication under these statutes and regulations, and the Plaintiffs cite to none, that DHR or the County Departments are statutorily or regulatorily required to provide educational, social, or extracurricular activities to children under its care.  Nor is there any allegation in the Second Amended Complaint that they prevented any of the Plaintiffs from engaging in any such activities.

The Plaintiffs have not plausibly shown that their injuries are fairly traceable to DHR or the County Departments.  Accordingly, the DHR Defendants' motion to dismiss Counts I and II will be granted on Article III standing grounds.[10]

---

[10] As for the parties' arguments related to the DHR Defendants' reliance on *Bacon v. City of Richmond*, 475 F.3d 633 (4th Cir. 2007), *Bacon* is not binding precedent.  *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1304 (11th Cir. 2022) ("The decision of any one of th[e federal] courts typically has little effect on the other courts of its type: one circuit's decisions are not binding on the others, and a district court's decisions do not bind other district courts, other judges on the same court, or even the same judge in another case.").

### 2.    Deliberate Indifference Under Title II of the ADA

Although Count I (inadequate education under Title II of the ADA) will be dismissed on standing grounds, the Court will address the other argument for dismissal of that count, namely the Plaintiffs' pleading of deliberate indifference. Only Defendants Buckner and the County Directors raise this issue.

Buckner and the County Directors assert the Plaintiffs fail to sufficiently plead deliberate indifference as to them for purposes of seeking monetary damages for individual harm specific to each Plaintiff. They also argue that they lack authority for educational programs or to implement corrective measures, and that particular to the Plaintiffs, there are insufficient allegations of actual knowledge that such measures were warranted at the PRTFs. They note that the DOJ investigation on which the DOJ Report is based, and on which the Plaintiffs rely, did not conclude until 2022, and while the investigation was pending, "[n]o interim conclusions or concerns about the education of any child, specifically the Plaintiffs, were provided to the DHR Defendants, if any were made." (Doc. 85 at 17–18.) They also note there is no specific information in the DOJ and ADAP Reports about the Plaintiffs and that the reports only contain "generalized observations allegedly made across a number of facilities." (Doc. 91 at 6–7.)

For their part, the Plaintiffs argue they have sufficiently pled deliberate indifference because the DHR Defendants have authority over educational screening, have a duty to conduct quarterly inspections over PRTFs, and had custody and control over Plaintiffs at the time of placement. The Plaintiffs also assert that, because of this custody, the DHR Defendants monitored them and were responsible for their welfare while at the facilities.

And turning to actual knowledge, Plaintiffs argue that the DHR Defendants had actual knowledge of discrimination at the PRTFs. Plaintiffs argue actual knowledge has been sufficiently pled because of the findings in the DOJ and ADAP

Reports, the public statements made by Buckner in relation to the ADAP Report, and the Second Amended Complaint allegations "that a social worker reporting to the Directors monitored Plaintiffs at all times Plaintiffs were held in the facilities." (Doc. 88 at 17.)

Again, to obtain damages for a Title II claim, a plaintiff must show deliberate indifference, a high burden. A plaintiff must show that a defendant not only knew that harm to the plaintiff's protected right was substantially likely, but also that the defendant failed to act on the likelihood. A plaintiff can hold a government entity liable if an official, who had authority to address and to correct the alleged discrimination on the government entity's behalf, had both actual knowledge of the discrimination and failed to adequately respond.

Like their assertions of deliberate indifference against the Education Defendants, the Plaintiffs fail to sufficiently plead deliberate indifference against Buckner and the County Directors. They fail to allege in a non-conclusory manner that Buckner and the County Directors had actual knowledge of the discrimination occurring within these programs or at the PRTFs. The Plaintiffs do allege that Buckner and the County Directors knew that the PRTFs were not providing the children access to their nondisabled peers and that the education at the PRTFs was insufficient compared to general education public schools. They also allege that social workers employed by the County Departments visited the PRTFs, acted at the direction of the County Directors and were "aware of the education and social problems . . . faced at all of the facilities." (Doc. 76 at 12, 27.) But these allegations are general and conclusory and fail to allege any underlying facts showing how Buckner and the County Directors had actual knowledge of the discrimination concerning each Plaintiff.

The Plaintiffs also point to Buckner's statement in which she acknowledges that "the ADAP report is absolutely unacceptable" and that "[o]ur staff has visited

with each of our children in these facilities." (*Id.* at 31 (quoting WAFF 48 Digital Staff, *Ala. DHR Responds to Report of Safety Issues, Abuse at Child Treatment Facility*, WAFF 48 (July 20, 2020, 10:21 PM), https://www.waff.com/2020/07/20/ala-dhr-responds-report-safety-issues-abuse-child-treatment-facility).) Such a statement does not show that Buckner's conduct harmed *these* Plaintiffs. Because the Plaintiffs request monetary damages, they must allege that Buckner or the County Directors' conduct harmed each of them. *See Greffey v. State of Ala. Dep't of Corr.*, 996 F. Supp. 1368, 1376–77 (N.D. Ala. 1998); *see also Connell*, 2022 WL 1215633, at *5 (stating that, in the Eighth Amendment context, "[a] conclusory allegation of personal knowledge is not enough; there must be factual allegations supporting the defendant's knowledge"). Accordingly, the DHR Defendants' motion to dismiss will be granted on this basis also.

### 3.     The ADA's Integration Mandate

In Count II, the Plaintiffs raise an ADA integration mandate claim. The DHR Defendants seek dismissal, stating that they do not administer education programs, services, or screenings, and particular to each of the Plaintiffs, they did not fail to integrate them. They also argue that their statutory and regulatory authority relates to initial placement. And to the extent that they could implement a placement decision, such a decision is only made with a directive from a supervising psychiatrist and treatment team. According to DHR Defendants, they also had no authority to develop or implement IEPs, determine eligibility for education services, or serve as a parent or surrogate for a child in educational decision making. These are the same general arguments made by the Education Defendants.

The Plaintiffs do not directly address the DHR Defendants' arguments related to the integration mandate. For this reason alone, the claim will be dismissed on grounds of abandonment. But even if they did, the claim is still due to be dismissed.

Under the ADA's integration mandate, a public entity must administer services, programs, or activities in a setting that is the most integrated and appropriate to the needs of qualified individuals with disabilities.  28 C.F.R. § 351.130(d).  In addition, under *Olmstead*, states are required to provide community-based treatment when (1) a state's own treatment professionals determine that placement is appropriate, (2) those affected do not oppose the treatment, and (3) the placement can be reasonably accommodated. *Olmstead*, 527 U.S. at 607; *Florida*, 938 F.3d at 1250.

The Plaintiffs fail to sufficiently allege in a non-conclusory manner, or show, that the DHR Defendants failed to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."   28 C.F.R. § 35.130(d).   The Plaintiffs do allege that the DHR Defendants are public entities required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" and that they failed to integrate the Plaintiffs with nondisabled children by never making "arrangements for field trips . . . to interact with . . . nondisabled peers while . . . institutionalized."  (Doc. 76 at 47–48.)

To the extent the Plaintiffs' allegation that the DHR Defendants "made no attempt to integrate [the Plaintiffs] with nondisabled children," (*id.* at 48), is construed as an allegation that the DHR Defendants failed to integrate the Plaintiffs in a classroom setting, that allegation is not enough to establish a claim under the integration mandate of the ADA.  At STCs, which the Second Amended Complaint repeatedly conflates with PRTFs, it is the local education agency or school board— not the DHR Defendants—that is responsible for ensuring that FAPE is provided. *See* Ala. Admin. Code § 290-8-8-.09(a)-(b).  There is no allegation, or legal authority provided, showing that the DHR Defendants are responsible for administering any educational services, programs, activities or FAPE to the children located at PRTFs.

27

In fact, the Plaintiffs indirectly acknowledge that local educational agencies are responsible for educational services because they allege that the DHR Defendants failed to communicate to local education agencies that it is a "best practice to evaluate children individually to determine if he/she could attend general public school." (Doc. 76 at 4–5.)

As for the Plaintiffs' argument that the integration claim is not limited to education, the Plaintiff only allege that the DHR Defendants failed to make "arrangements for field trips . . . to interact with . . . nondisabled peers while . . . institutionalized." (*Id.* at 48.) Such an allegation is conclusory, and the Plaintiffs fail to allege any underlying facts supporting the claim. The Plaintiffs do argue that the DHR Defendants "could have elected to take Plaintiffs on a field trip, a social outing, or some enrichment activity," (doc. 88 at 13), but the Plaintiffs' argument rests on hypotheticals and is not sufficiently developed.

The Plaintiffs do not plausibly allege that the DHR Defendants failed to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. Nor have they provided any legal citation showing that the DHR Defendants bear such legal responsibility to integrate the Plaintiffs. Accordingly, the DHR Defendants' motion to dismiss as to Count II will be granted.

## VI. CONCLUSION

It is therefore **ORDERED** as follows:

1. The Education Defendants' *Motion to Dismiss Plaintiffs' Second Amended Complaint* (doc. 84) is **GRANTED**.

2. The DHR Defendants' *Motion to Dismiss Second Amended Complaints* (doc. 85) is **GRANTED**.

3. The Plaintiffs' Second Amended Complaints (doc. 76; doc. 77; doc. 78;

doc. 79) are **DISMISSED WITH PREJUDICE**.[11]

DONE, on this the 10th day of February 2025.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE

---

[11] Since Plaintiffs have already been given an opportunity to file an amended complaint and since the filing of yet another amended complaint would be futile in light of Alabama law that places the obligation to educate and integrate at the feet of the local boards of education, which are not parties in this case, dismissal with prejudice is appropriate.